M3TsNUNc

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        22 MJ 2591 (KPF)

 5   JOWENKY NUNEZ,

 6              Defendant.

 7   ------------------------------x

 8                                    New York, N.Y.
                                      March 29, 2022
 9                                    2:00 p.m.

10
     Before:
11
                    HON. KATHERINE POLK FAILLA,
12
                                      District Judge
13

14                      APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     BY:  KEVIN B. MEAD
17        Assistant United States Attorney

18   JEFFREY PITTELL
          Attorney for Defendant
19
     ALSO PRESENT:
20   LAURA GIALANELLA, Pretrial Services Officer

21

22

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

M3TsNUNc

```
1            (Case called)
2            THE DEPUTY CLERK:  Counsel, please state your name for
3    the record, beginning with government.
4            MR. MEAD:  Good afternoon, your Honor.  AUSA Kevin
5    Mead, appearing for the government, joined at counsel table by
6    Pretrial Services Officer Laura Gialanella.
7            THE COURT:  Good afternoon to each of you.  Thank you
8    very much.
9            Mr. Pittell.
10           MR. PITTELL:  Good afternoon, your Honor.  Jeffrey
11   Pittell, appearing for Mr. Nunez.
12           THE COURT:  Thank you very much.
13           Mr. Nunez, good afternoon to you.
14           THE DEFENDANT:  Good afternoon.
15           THE COURT:  You're welcome to be seated, sir.  Thank
16   you.
17           Mr. Pittell and Mr. Mead, let me advise you that I
18   have read the complaint in this case.  I've read the
19   submissions that I've seen on the docket in the case.  I've
20   read the government's submission of March 28 and the various
21   exhibits, including, in particular, the transcript of the prior
22   proceeding before Judge Moses, and there was a video clip that
23   I have seen.
24           I suppose why I'm telling you this is to say that I'm
25   not sure you need to repeat the arguments that you made before
```

M3TsNUNc

|   | |
|---|---|
| 1 | Judge Moses.  Perhaps what you would like to do is to focus on |
| 2 | what has happened since then that caused you, the government, |
| 3 | to appeal from the grant of bail and you, Mr. Pittell, to |
| 4 | continue to wish for bail.  And perhaps, Mr. Mead, if your |
| 5 | point is that Judge Moses erred in some way, which I'm sure is |
| 6 | not the case, you can tell me that as well. |
| 7 | Mr. Mead, may I begin with you, please, sir. |
| 8 | MR. MEAD:  Sure, your Honor.  Thank you. |
| 9 | I Won't recapitulate the timeline in this case, unless |
| 10 | that would be helpful to the Court.  I want to start with where |
| 11 | we respectfully believe that Judge Moses got things wrong. |
| 12 | There are a couple of points that I think she didn't fully |
| 13 | consider in this case, one of which was the evidence -- some of |
| 14 | that was because it wasn't put before her, of course.  One of |
| 15 | those was the shooting on March 4 of 2020.  We presented Judge |
| 16 | Moses with two still images at that court appearance.  One |
| 17 | still image was the picture of Mr. Nunez holding a firearm, and |
| 18 | then there was one of the still images from the deli, I forget |
| 19 | exactly which of them. |
| 20 | THE COURT:  Sir, one thing you referred to as a |
| 21 | March 4, 2020 shooting.  Do you mean 2022, as in a couple of |
| 22 | weeks ago? |
| 23 | MR. MEAD:  I do, your Honor. |
| 24 | THE COURT:  That's fine.  I want to make sure I'm |
| 25 | looking at the correct thing. |

M3TsNUNc

1          MR. MEAD:  Yes, as in earlier this month, yes.

2          What Judge Moses did not have at that time was the

3     shooting video, and she, in fact, pointed that out several

4     times in the bail transcript.  She said:  How am I supposed to

5     make this determination without even having the video?  With

6     only having, you know, these two still images, am I really

7     supposed to conclude that Mr. Nunez committed a shooting a few

8     weeks ago and hold a man on that basis, based on those still

9     images.

10          THE COURT:  Responding to that, sir, I don't doubt --

11     I think you have a very good argument that the person in the

12     video is the person who is later in the deli.  The question

13     really becomes whether the person in the deli is, in fact,

14     Mr. Nunez.  I mean this with no disrespect.  The principal

15     thing to which you wish to draw my attention are his eyes and

16     his eyebrows.  I don't know if there is anything else in social

17     media postings, in his phone, in anything that would lend

18     further support to your argument that he is this person.

19          MR. MEAD:  I think just a few points.  I think your

20     Honor's correct.  In most cases, we would have a hard time

21     making identification.  My view, and the view from the agents

22     we have spoken with, is actually that the top half of this

23     defendant's face is quite distinctive looking.  The build is

24     the same.  It does appear, based solely on that, to be the

25     defendant.

M3TsNUNc

1        I think the location of the shooting is also

2   significant.  The location of the shooting is this -- right

3   near this area where the defendant's gang concentrates its

4   activities.  It is near where we now believe the defendant to

5   have been living for the past several months after we learned

6   that his previous address was incorrect.  And there's several

7   other gang members who are visible in the deli video as well

8   who Mr. Nunez is interacting with.

9        I think those are the principal reasons why we believe

10  that he is the shooter in this case.  I recognize that,

11  obviously, that's not charged at the moment, and it's not been

12  indicted as a shooting so far, but when the Court is

13  considering dangerousness, as it is here, I think the fact that

14  there is a strong case that this defendant committed a shooting

15  just a few weeks ago while on pretrial release in two

16  jurisdictions is just hugely important here.  So that is why we

17  felt we needed to bring it to the Court's attention.

18        THE COURT:  Certainly, I understand that.  Let me

19  please understand this a little bit better.  Am I able to

20  discern from the video that you sent to me other individuals

21  from the gang?  And when you say that, are you speaking of

22  other individuals whose mugshots are contained in your letter

23  or in the complaint?

24        MR. MEAD:  So the video of the shooting itself, no,

25  your Honor.

M3TsNUNc

| | |
|---|---|
| 1 | THE COURT:  Thank you. |
| 2 | MR. MEAD:  There is surveillance video from the deli. |

 1    THE COURT:  Thank you.

 2    MR. MEAD:  There is surveillance video from the deli.

 3  Obviously, we haven't provided that full video.  We have

 4  provided what we thought were the most significant excerpts in

 5  terms of being able to identify the defendant.

 6    THE COURT:  I see.

 7    MR. MEAD:  If you look at the angle on the top, on the

 8  right, that's a separate angle that shows the exterior of the

 9  deli.

10    THE COURT:  What page?  You're talking about --

11    MR. MEAD:  Page 5.

12    THE COURT:  -- Page 5, the furthest on the right?

13    MR. MEAD:  Right.

14    That angle, that's a zoom in, right, so that's not the

15  full video angle.

16    THE COURT:  Yes, sir.

17    MR. MEAD:  That video, you can see the people in the

18  deli, you can see the people outside the deli.  And I'm doing

19  this a bit from memory, your Honor, but my memory is that the

20  defendant interacts with several people outside the deli.  He,

21  I think, shakes hands with them, he goes inside, he talks to a

22  few other people, and my memory is that there's a gang member

23  who uses the alias Po-Po Bills, who is visible on the -- I want

24  to say who is inside the deli as well and who Mr. Nunez is

25  clearly interacting with.  I think they walk in together,

M3TsNUNc

1   actually, into the deli.

2           That is not visible in the video that the Court has.

3   It's not visible in the pictures that are in the government's

4   attention memo.

5           THE COURT:  You'll excuse me for not knowing -- I'm

6   not sure I knew before you told me that these other

7   individuals --

8           MR. MEAD:  I think there's just one line, your Honor,

9   somewhere about -- give me a second.  Maybe that line came out.

10  Maybe there's not.  I can represent to the Court that we do

11  believe that there are associates of the defendant present in

12  the deli as well.

13          THE COURT:  OK.  Please continue, sir.

14          MR. MEAD:  I'm going to move on from that shooting,

15  unless the Court has additional questions about it.

16          THE COURT:  Not about the shooting, sir.  Thank you.

17          MR. MEAD:  All right.  We reference in the

18  government's letter that the defendant is a suspect in multiple

19  homicides.

20          THE COURT:  Yes.  I also saw that Judge Moses did what

21  I would have done as well and asked for something other than a

22  conclusory statement that he was.  What can you tell me, sir?

23          MR. MEAD:  I can tell you we have witness statements

24  indicating that this defendant committed the homicide.  I'm

25  sure the Court wishes it had more detail.

M3TsNUNc

1        THE COURT:  Yes.

2        MR. MEAD:  We're in a position, due to witness safety

3    concerns, where we really can't say anything more than that.  I

4    understand that the Court may discount, to some extent, that

5    evidence as a result.  We recognize that.  It is a difficult

6    position for both the government and the Court.  We did feel,

7    though, again, in the context of determining whether a

8    defendant is dangerous or not, that it would be irresponsible

9    of us to not at least let the Court know about something quite

10   so significant in the dangerousness calculus.

11       THE COURT:  Could you speak, please, sir, to the

12   Manhattan shooting that is of March 30 of 2020.  Do I

13   understand that to be the basis of the state court case?

14       MR. MEAD:  It is, your Honor.

15       THE COURT:  Let me look back at the pretrial services

16   report.  I don't believe -- it does speak to criminal

17   possession of a weapon and reckless endangerment, if this is

18   the same thing, if this is the 12/22/2021 arrest.

19       MR. MEAD:  I don't have the bail report, your Honor.

20   My memory is the bail report makes clear, on the far left side,

21   that the offense conduct is from March of 2020.

22       THE COURT:  It does say that.  Thank you very much.

23       MR. MEAD:  Yes, that's the same shooting.  He was not

24   charged right away in that case.  He was charged, in fact,

25   while he was detained pretrial in Massachusetts.

M3TsNUNc

1          THE COURT:  Yes.

2          Do I understand, or perhaps I'm overstating this, is

3    it the government's intent to take over the Massachusetts case

4    or the New York case?

5          MR. MEAD:  As the Court knows, "take over" is a term

6    we try to avoid.  We plan on charging, fundamentally, the same

7    conduct in the Massachusetts case --

8          THE COURT:  Of course.

9          MR. MEAD:  -- in our case, and it is described in

10    detail in our complaint.  There's a bit more detail in this

11    memo about the flight at 140 miles an hour because we thought

12    that was significant.  That conduct is charged in our

13    complaint.

14          It is not our present intention to charge the

15    March 30, 2020 shooting.  It is certainly possible that that

16    would happen, but it's not our present intention.  I don't have

17    many details about that shooting.  I've been informed by the

18    agents it is a shooting.  I've also reviewed the docket on

19    *WebCrims*.  He is charged, he's been indicted, on the reckless

20    endangerment in the first degree.  Footnote one, I think, of

21    our memo lays out what it takes to be guilty of reckless

22    endangerment in the first degree.

23          THE COURT:  Yes, sir.

24          MR. MEAD:  It sounds like, you know, a less serious

25    crime than it is.  I know, from my research and in the

M3TsNUNc

 1   sentencing context, it fundamentally means you've shot at

 2   someone.  Shooting up in the air, even, is held to be only

 3   reckless endangerment in the second degree.  Reckless

 4   endangerment in the first degree, combined with the criminal

 5   possession of a weapon, makes me virtually certain it is a

 6   shooting, and the agents have confirmed to me it is the

 7   shooting, although I have not reviewed the underlying evidence

 8   in that case or the underlying circumstances or anything like

 9   that.

10           THE COURT:  In any event, it is not presently

11   contemplated to be part of this case, whereas the March 2022

12   shooting is, at least in theory, going to be incorporated in

13   this case?

14           MR. MEAD:  Correct, your Honor.

15           THE COURT:  There are other shootings, too?

16           MR. MEAD:  Are you referring to the homicides?

17           THE COURT:  Indeed, I am.  Was the homicide by means

18   other than shooting?

19           MR. MEAD:  No, it was a shooting, your Honor.  There's

20   a reference to four homicides --

21           THE COURT:  There is.

22           MR. MEAD:  -- in the memo.

23           THE COURT:  I'm sorry.  The March 4, 2022, is

24   different, it's not a homicide.

25           MR. MEAD:  It's not a homicide, that's correct, your

M3TsNUNc

1  Honor.

2          THE COURT:  There was a bystander hit.  What about the

3  intended target, was he or she hit?

4          MR. MEAD:  We don't have information about that.

5          THE COURT:  Fair enough.

6          MR. MEAD:  They didn't report to a hospital and say we

7  got hit.  It's possible they were hit as well, of course.

8          THE COURT:  Understood.

9          Sir, was there another issue that -- I did not mean to

10  derail you -- where you believe Judge Moses had incomplete

11  information?

12          MR. MEAD:  Fundamentally, there's more evidence about

13  the March 4 shooting, the homicides, and then the results of

14  this search that the government conducted yesterday.  So I'm

15  sure the Court has read the transcript and the excerpt in the

16  government's memo.

17          THE COURT:  Yes.  As you hinted at in your submission,

18  the pretrial services report does recite the Tinton Avenue

19  address as the address at which Mr. Nunez was living from

20  December of 2021 on.

21          MR. MEAD:  Correct, right.  So, the defendant

22  represented to pretrial that's where he was living.  The mother

23  represented to the court directly that that is where the

24  defendant was living.  That was significant to Judge Moses

25  because the other address where we thought the defendant might

M3TsNUNc

1    be was in the area in Washington Heights, where this gang

2    concentrates its activity, and Judge Moses didn't want him

3    there for, I think, very understandable reasons.

4            We now know, of course, that that appears to be where

5    he was living.

6            THE COURT:  Where is that, please, sir?

7            MR. MEAD:  I think it is referenced -- do you mind if

8    I borrow that memo?

9            THE COURT:  Audubon Avenue.

10           MR. MEAD:  Correct.

11           THE COURT:  That's the residence with his

12    grandparents?  I have a recollection --

13           MR. MEAD:  That's my memory from the pretrial services

14    report as well, your Honor, yes.

15           I think it is significant, obviously, he was, in fact,

16    living in a more dangerous area, but I think what is more

17    significant is the lie to pretrial services and the lies to the

18    court.  The lies by the defendant, of course, are a strong

19    indicator that he cannot be trusted on supervision and that he

20    is not going to comply with supervision.

21           The mother's lies are just as troubling, or perhaps

22    more troubling.  Judge Moses intended that the mother be

23    intended as the third-party custodian, right?  So she was the

24    person who -- and this is, of course, difficult for a mother

25    and her son -- who would -- if the defendant did anything

1  wrong, would be required to call pretrial, call the police, and

2  report him, and maybe have him go to jail because of a phone

3  call she made.  She said she would be able to do that, and

4  Judge Moses made her the third-party custodian.

5          THE COURT:  Can I ask you to slow down, please.

6          MR. MEAD:  I apologize, your Honor.

7          THE COURT:  That's fine.

8          Go ahead, sir.

9          MR. MEAD:  Judge Moses made her the third-party

10  custodian based on those statements she made.  Those, of

11  course, we now know to be false.  Agents searched that address,

12  the address where she lives.  They found a single piece of male

13  clothing, a pair of male underwear, no other male clothing.  Of

14  course, the defendant did not, in fact, live there.  And just

15  as significant, they spoke with the mother at the time they

16  executed this search yesterday, and she told them that he

17  didn't live there.  She told them that he had not slept there a

18  single night since he was released on bail in December of 2021.

19          So I think it is really conclusive proof that both the

20  defendant and the defendant's mother lied to the court, to

21  pretrial services, and that the mother cannot be trusted to act

22  as a third-party custodian, which in my understanding from

23  Judge Moses, that was a critical condition in allowing her to

24  feel comfortable that this defendant could be released on bail.

25          THE COURT:  Sir, there was discussion, as well, about

M3TsNUNc

1    an intervention program that I knew as ROAR, R-O-A-R.  It's

2    referred to in the pretrial services report.  I saw that a

3    portion of that program involved checking in with someone

4    monitoring the case and, as well, Mr. Nunez attending school.

5    My question is:  Did it matter to the ROAR program where he

6    lived, and what did he tell the ROAR program about where he

7    lived, if you know?

8            MR. MEAD:  Do you mind if I take a quick look at that?

9            THE COURT:  Please.

10           (Pause)

11           MR. MEAD:  New York or Massachusetts?

12           THE COURT:  New York.

13           MR. MEAD:  The short answer is I don't know, your

14   Honor.  I spoke with Massachusetts pretrial officer, but I have

15   not spoken with the New York State pretrial officer.  So I

16   don't have any information about that other than what is

17   contained in the pretrial report.

18           THE COURT:  OK.

19           Ms. Gialanella, may I ask you – I know you weren't the

20   officer who wrote this report – do you have any knowledge about

21   the obligations of the ROAR program?

22           MS. GIALANELLA:  I'm not, obviously.  I wish I had

23   more information for you.

24           THE COURT:  That's fine if you don't.

25           MS. GIALANELLA:  I'm sorry.

M3TsNUNc

1          THE COURT:  I'm not going to worry about that.

2          Mr. Mead, before you sit down, my expectation is that

3   Mr. Pittell is going to tell me that any concerns I have about

4   the mom and her truthfulness can be laid by the fact that there

5   would be electronic monitoring equipment and home

6   incarceration.  Why shouldn't that give me comfort that

7   Mr. Nunez will not flee or be a danger to the community?  In

8   particular, sir, is there evidence that the narcotics

9   trafficking was conducted from the Tinton Avenue residence or

10  from the Audubon Avenue residence?

11          MR. MEAD:  I'll address the last point first.

12          THE COURT:  Yes, sir.

13          MR. MEAD:  The government is not aware of any evidence

14  that the narcotics trafficking was conducted from either of

15  those residences.  My memory is that the photographs of the

16  defendant with firearms are indoors, and there's some video of

17  the defendant with firearms indoors.

18          THE COURT:  Yes.

19          MR. MEAD:  I don't know, honestly, if that is his

20  residence or another residence.  I think there's a good chance,

21  at least, it's another residence, and I recognize that.

22          The narcotics trafficking, much of it was hand-to-hand

23  outside, you know, on the corner.

24          THE COURT:  Yet, based on my read of the complaint,

25  sir, there is a fair amount of evidence showing text messages

M3TsNUNc

1  suggesting or suggestive of narcotics trafficking.  But do I

2  understand correctly there's no surveillance of Mr. Nunez.

3  How, then, did he fit into the conspiracy in the government's

4  estimation?

5       MR. MEAD:  The undercover buys in the complaint, the

6  vast majority of them, if not perhaps all of them, took place

7  when the defendant was incarcerated pretrial in Massachusetts.

8  Our understanding, fundamentally, of how this narcotics

9  organization worked is that Jerrin Pena, who is the top

10  defendant on the complaint, operated at a hand-to-hand

11  business.  He would have people working shifts, meaning

12  standing out on the street for a couple of hours a day, always

13  someone out there, and they would sell to whoever came to them,

14  right?  There would always be someone working for Mr. Pena out

15  on the corner.  Our understanding is that Mr. Nunez was one of

16  those people who was working selling out on the corner in

17  shifts.

18       By the time the government started zeroing in, though,

19  on that corner and making undercover buys and such, the

20  defendant was, of course, incarcerated pretrial.  So he was not

21  one of those individuals.  We know he was doing this narcotics

22  trafficking by putting together what we know from the

23  undercover buys with what we see in his messages and in his

24  social media posts indicating conversations about shifts,

25  conversations about Pena, and the drug activity he was involved

M3TsNUNc

1    in and him saying, you know, don't write anything like that on

2    Instagram, don't write anything like that on Instagram.

3         I think the Court had started by asking why isn't home

4    incarceration with electronic monitoring sufficient here?

5         THE COURT:  Yes, sir.

6         MR. MEAD:  I think that there are a couple of reasons.

7    One is, of course, the defendant was in what appears to be a

8    fairly intensive supervision program beforehand, right?

9    Between December and the shooting and his arrest in this case

10   in March, he was supervised, in fact, by two separate

11   jurisdictions.  The New York -- the report refers to the New

12   York supervision as somewhat high intensity, in my memory, in

13   terms of points of contact.  It certainly appears to the

14   government that that supervision was totally ineffective.  In

15   fact, the defendant attempted to murder someone while he was on

16   that pretrial supervision.

17        THE COURT:  Well, there is no evidence that he was

18   engaged in drug trafficking.

19        MR. MEAD:  Not at the moment, no, your Honor.  No

20   evidence from the government at the moment that he was involved

21   in the drug trafficking in that four-month period.

22        THE COURT:  And he surrendered?

23        MR. MEAD:  He did surrender, your Honor, yes.  I think

24   the surrender goes largely to the risk of flight point.  But

25   staying on the reasons why we think home incarceration is an

1    issue, it's one that has been ineffective in the past.

2    Supervision has been ineffective in the past.  I think it's

3    two, this defendant has such, I would say, a spectacular

4    history of violence, that I don't have any confidence at all

5    that any sort of conditions are going to be sufficient to deter

6    him from cutting his bracelet or walking out on the street and

7    killing someone.

8            Three, the lies to pretrial services and the mother's

9    lies to the court, I think, also give me great pause in

10   trusting any sort of pretrial ability to prevent this defendant

11   from going out and committing more crimes.

12           I'll turn briefly to risk of flight, unless the Court

13   has additional questions.

14           THE COURT:  I do not.

15           MR. MEAD:  Look, I think risk of flight is a less

16   compelling argument in this case, largely because the defendant

17   is so dangerous and because, of course, the defendant

18   self-surrendered, which is a point in his favor, certainly.

19           However, as our memo points out, there are still good

20   reasons to believe that this defendant is someone who is likely

21   to flee.  His incentives have changed.  When he surrendered, he

22   wasn't counseled.  He didn't know what kind of sentence he was

23   facing.  He now knows that he is looking at a 15-year mandatory

24   minimum, and he knows that he is a suspect in multiple

25   homicides.  This is a defendant who may go to jail for 30 years

M3TsNUNc

1    in this case.

2            His incentives have shifted, his incentives are now to

3    flee, to get out of Dodge rather than face the music.

4            Two, there are the events in Massachusetts, when the

5    defendant was apprehended the last time around.  As the Court

6    is aware, we are not aware who was driving this Mercedes, but

7    when law enforcement tried to stop the Mercedes, the stolen

8    Mercedes, that the defendant was in, the Mercedes took off 135

9    to 140 miles an hour, which is wildly dangerous, of course,

10   they fled into a mall or into a grocery store, and when the

11   defendant was finally apprehended, he gave a fake name.  He

12   gave Edison Baes.  He was charged under the fake name briefly.

13   It took the government in Massachusetts a day or two to figure

14   out who he really was.

15           So it's a defendant who, you know, attempted to evade

16   arrest when caught.

17           There is, of course, the history of supervision

18   failing in Massachusetts and in New York.  That indicates, I

19   think, that the defendant is likely to flee.

20           Then, finally, the lie to pretrial by the defendant

21   and his mother, I think, are also troubling in giving the Court

22   confidence that this is a defendant who can be trusted to

23   appear when required to.

24           I'm happy to answer any additional questions for the

25   Court, but, otherwise, we rest on our submission.

M3TsNUNc

1          THE COURT:  Thank you.  No, actually, I asked the

2     questions I wanted to.

3          Mr. Pittell.

4          MR. PITTELL:  Well --

5          THE COURT:  Sir, is it easier for you to sit down?  I

6     always am concerned about audibility issues in this courtroom.

7     If it is easier to sit down, please do so.

8          MR. PITTELL:  All right.  Thank you.

9          Obviously, it goes without saying that we deny and

10     disagree with some of the speculative allegations the

11     government has made, specifically regarding the four homicides.

12     Other than what they are saying, I have nothing to challenge

13     that other than just a summary denial.  The same thing with the

14     shooting.

15          I must acknowledge, I missed the government's e-mail

16     when they forwarded the detention memo and the video

17     attachments, so I didn't read it, the memo, until I came

18     before, so I haven't seen the video which was attached.  But

19     I'm assuming that, looking at the still photos, the face is

20     covered, and they are trying to do a comparison with a

21     two-year-old photo which is below that and that there is no

22     actual image of Mr. Nunez in the videos.

23          Risk of flight and danger to the community is kind of

24     combined in this case because the bail proposed by Judge Moses,

25     which we consent to, basically incarcerates him in the home, so

M3TsNUNc

1    that's going to prevent him from going out and being a danger

2    to the community.

3         The government has tried to portray him as someone

4    who, if released, is going to be all over the place and he

5    can't be trusted.  But he's been trusted by two different

6    judges, and he's been compliant.

7         THE COURT:  Except for the fact that he gave the wrong

8    address, and so did his mom.  His mom actually lied to Judge

9    Moses openly.  I mean, we can't even get around that.  She

10   concedes now that she lied, and that is very concerning to me.

11        MR. PITTELL:  I haven't been able to speak with her,

12   because I first found out about that when I got the

13   government's memo.  I spoke with the mother yesterday while the

14   police were searching her house, and she was terrified,

15   hysterical, and she told me that there was a banging on the

16   door, and people were screaming at her, threatening to kick the

17   door open, unless she opened the door.

18        I will speak with her about what she said to the

19   agents in the context of that, but I can't address that at the

20   moment.

21        THE COURT:  Are you telling me now, sir, that your

22   client resided at the Tinton Avenue address from December of

23   2021 through his self-surrender?

24        Because, if so, you're going to also contend with the

25   fact that there was a single article of clothing found at the

M3TsNUNc

1    house that belonged to him, even though he supposedly

2    surrendered from that house on the 24th.

3            If you're going to say that, go ahead, please.

4            MR. PITTELL:  I really need to speak with the mother

5    before I address that.  The mother was supposed to be here.  I

6    told her to come at 2:30.

7            THE COURT:  Yes.

8            MR. PITTELL:  All right.  But going back to the risk

9    of flight, the mother has provided and represented to Judge

10   Moses that she -- that he has a room and that he can stay

11   there.  I'm assuming the agents verified that there was a room

12   that he can stay in.  And in terms of his being a risk of

13   flight, the fact that he surrendered twice to the 34th Precinct

14   is significant.

15           In Massachusetts, originally, he was detained without

16   bail, but then in Massachusetts, if 180 days goes by, a person

17   is detained without bail, then they are entitled to bond.  So

18   after 180 days, a bail hearing was held, and the judge

19   determined that $5,000 was an appropriate bond, and then he was

20   released.  He was making his court appearances in person.

21   There was telephone reporting to, I guess, the equivalent of

22   pretrial services.  The government referenced one missed call,

23   but that was on the day that he had a court appearance that day

24   earlier in the week, didn't realize that he had to call in on

25   that Thursday.  I spoke with his attorney about that.  The

M3TsNUNc

1    attorney spoke with the ADA.  They held off issuing a warrant,

2    and the call was made, and he was compliant.

3         Regarding the New York case, so he was released from

4    Massachusetts, he came to New York, and he immediately

5    surrendered to the 34th Precinct, and then he was placed

6    originally on intensive supervision, and they did home visits

7    with him at the mother's residence, and then he was placed --

8    because he was compliant with that supervision, he was then

9    placed in the ROAR program.  That started, approximately, about

10   two weeks ago, but he started attending mental health

11   counseling, job counseling.  He was also working and going to

12   school.

13        In this particular case, the government is emphasizing

14   that he only surrendered because he didn't know the seriousness

15   of the case, but I disagree.  I looked up the press release

16   issued by the government.  The press release expressly states

17   that there's a ten-year mandatory minimum on the drug charge

18   and a consecutive five-year sentence on the gun charge.  It

19   includes a link, a link to the PDF of the complaint, which has

20   a picture of Mr. Nunez with a gun.  When I first met Mr. Nunez,

21   he told me he had actually read the entire complaint before I

22   had seen him.  And that's because once the press release was

23   issued, it was disseminated to media outlets, and Mr. Nunez saw

24   it either on news reports or by people re-reporting news

25   reports over various social media.

1           So when he walked into the police station, he knew

2   there was a likelihood that he was not going to walk out,

3   and -- or he certainly knew he was not going to walk out that

4   night, but he certainly knew that there was a possibility,

5   based upon the charges against him, that he might not walk out

6   of jail for 15 years.  That's very significant in terms of risk

7   of flight.  He didn't wait a day or two, he immediately went

8   that night.  I don't think that that can be understated in

9   terms of a factor in terms of whether or not he's a flight

10  risk.

11          In terms of the dangerousness to the community, as I

12  mentioned, the proposed bail package -- I think the family is

13  here -- includes that he will be residing in his mother's

14  residence and that she has represented that she will be a

15  third-party custodian.  I'm sure that she would be willing to

16  do that again to your Honor.  He will have an ankle bracelet

17  on.  They are going to know whether or not he leaves the

18  residence.  I think that that is a sufficient assurance that he

19  is not going to be a risk of flight or dangerousness to the

20  community.

21          THE COURT:  Mr. Pittell, I think you should check with

22  the mother of your client now and tell me whether the

23  government is correct that she acknowledged that he did not

24  live in the Tinton Avenue address for the relevant time period.

25          MR. PITTELL:  OK.  Thank you.

M3TsNUNc

```
 1              THE COURT:  Thank you.

 2              (Recess)

 3              MR. PITTELL:  All right, Judge, I've had an

 4    opportunity to speak with her.  She will say that he was

 5    staying there and that she was terrified and felt pressured by

 6    the agents when they came and said that they were knocking --

 7    they were going to knock open the door, and she said that --

 8    and she will come up and testify that she -- when the agents

 9    asked if he was living there, that she said no because she was

10    hoping that they were going to leave and not search the house.

11              THE COURT:  But they did search the house, and they

12    found one man's undergarment.

13              MR. PITTELL:  She said there was other clothing there

14    and that he has his own room where he sleeps.

15              THE COURT:  All right.  Mr. Mead, can you get me an

16    agent tomorrow or Thursday who was present at the search?

17              MR. MEAD:  I could, your Honor.  I mean, if it was

18    significant to the Court, I could, perhaps, get you an agent

19    within ten minutes or so.  I don't want to promise that.

20              THE COURT:  I appreciate that, sir.  Unfortunately, my

21    calendar -- another matter has jumped in ahead of you, sir.  My

22    3 o'clock is booked.

23              But I have some time tomorrow, and, look, it is very

24    significant to me.  Let me be just very transparent with the

25    parties.  I'm not sure what to make of the video and the
```

M3TsNUNc

1    stills.  It is of concern, but I'm not sure it is dispositive.

2    But if his mother lied about where he was staying, that is

3    dispositive of her ability to be a custodian for him during

4    this period of time.  So, yeah, if it turns out she's lying,

5    she will have much bigger problems, of course, but I would like

6    to have -- I would like to resolve that issue.  It is of

7    significance to me in making this decision.

8            So tomorrow -- I can do 2 o'clock tomorrow, I think.

9    I believe Judge Cote is handling the bail appeal that was going

10   to be then.  I can do 10 o'clock tomorrow morning.  Tell me

11   what works for you.  We'll try and work with Mr. Mead to have

12   Mr. Nunez produced again.

13           Mr. Pittell?

14           MR. PITTELL:  Judge, unfortunately, I can't make it in

15   the morning.  The afternoon --

16           THE COURT:  What is the earliest you can make it, sir?

17           MR. PITTELL:  It's kind of hard to say.  I'm actually

18   going to a funeral tomorrow morning at 11:30.

19           THE COURT:  I'm sorry to hear that.

20           MR. PITTELL:  I'm sorry.  I, obviously, don't know

21   when it is going to start and when it is going to finish.

22   Though, I would like --

23           THE COURT:  What about Thursday morning, sir,

24   10:00 a.m.?

25           MR. PITTELL:  I can come Thursday morning.  If you

M3TsNUNc

1  prefer to do it tomorrow afternoon a little bit later, I think

2  I would feel more comfortable, but...

3          THE COURT:  Well, my tomorrow afternoon is that I have

4  an arraignment at 3 o'clock.  I have the 2 o'clock, I suppose I

5  have a 4 o'clock.

6          MR. PITTELL:  I'm sure I'll be ready by 4 o'clock.

7          THE COURT:  Mr. Mead, does 4 o'clock work for you?

8          MR. MEAD:  4 o'clock does work for the government.

9  That would be fine.

10          I would want to confirm with the agents, but there

11  were multiple agents there.  That doesn't seem like it should

12  be a problem.  If it is, I'll contact the Court, of course.

13          THE COURT:  It won't be a problem, sir.

14          Also, if there are -- if there are more than one

15  agent -- if there is more than one agent who needs to testify

16  to different things, if someone did the search and someone else

17  did the interview, that's fine, too.  Just please let me know.

18          MR. MEAD:  Sure.

19          Just one additional -- two additional points.  One is

20  I'm not aware of whether there was a body cam or not.  If there

21  was, we'll see what we can do about that on relatively short

22  notice.

23          THE COURT:  Yes, of course.

24          MR. MEAD:  The other point is I know a DV 6 was

25  written for this -- or a DEA 6 was written for this.  We will

M3TsNUNc

1    produce that to the defense, of course.  I just want -- I'm a

2    little bit hesitant biting on a larger *Giglio* or 3500

3    obligation for something like this.  It seems to me that simply

4    providing the six would be sufficient.

5              THE COURT:  Mr. Pittell, let me hear from you.

6              I mean, look, Mr. Mead, I think you can ask your

7    witnesses if they've ever been found to be not credible by a

8    judge if they have their own arrest history or things of that

9    nature.

10             Mr. Pittell, do you agree?

11             MR. PITTELL:  Yes, I would.

12             THE COURT:  We're doing this in 24 hours.

13             MR. PITTELL:  I understand.

14             THE COURT:  Because you're not prepared to go forward

15   today, sir.

16             MR. PITTELL:  Full disclosure, several days in

17   advance, but it is a bail hearing.  I understand.  I think,

18   really, the dynamic of what happened is important.

19             THE COURT:  Yes, it is.

20             All right.  Then it's unfortunate we're not able to

21   resolve this today.  I understand from my deputy that she will

22   work towards getting Mr. Mead produced for tomorrow -- that was

23   a Freudian slip -- Mr. Nunez produced for tomorrow.  Mr. Mead,

24   I will see you then.

25             Again, my condolences to the family that you are

M3TsNUNc

1    visiting tomorrow for the funeral.

2            I'll see everyone at 4:00 p.m. tomorrow.  Thank you

3    very much.

4            (Adjourned)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25